### 644.   TAYLOR *v.* THE STATE.

1. There is no material variance between the allegata and the probata, and the allegations of the indictment were sufficiently proved as laid.
2. The court fully, fairly, and clearly submitted to the jury the issues, and the law applicable thereto. The exceptions to portions of the charge are without merit.
3. A new trial is granted solely because the trial court violated the spirit of section 4334 of the Civil Code.

Indictment for larceny after trust, from Worth superior court—Judge Spence. June 15, 1907.

Argued October 7,—Decided October 29, 1907.

*Perry & Williamson, Pope & Bennet, J. J. Forehand,* for plaintiff in error.

*W. E. Wooten, solicitor-general, J. H. Tipton,* contra.

HILL, C. J. Taylor was convicted in the superior court of Worth county, on an indictment charging him with the offense of larceny after trust, under the Penal Code, §195. The character and purpose of the trust, and the fraudulent breach thereof, are described in the indictment, in the following language: "For that the said Charles L. Taylor did, on the first day of October, 1906, in the county aforesaid, being intrusted by the Virginia-Carolina Chemical Company with the following described promissory notes, to wit: [Here follows a list of the notes, giving the names of the makers, dates and amounts], all of said notes being due on October 1st, 1906, payable to Charles L. Taylor or order, and by the said Taylor transferred and assigned to said Virginia-Carolina Chemical Company, said notes being intrusted to said defendant, as aforesaid, for the purpose of said defendant collecting the money due on said notes and each of them, and paying

the proceeds and moneys collected on said notes and each of them over to the said Virginia-Carolina Chemical Company, he, the said defendant, being intrusted as aforesaid, did collect the moneys and proceeds on and from said notes and each of them, in the amounts hereinbefore respectively stated, and did then and there wrongfully, fraudulently, and feloniously convert said moneys and proceeds to his, said defendant's, own use." In proof of the allegations in the indictment, the State introduced the following evidence, here substantially stated: (1) Agreement between the Chemical Company and the defendant, dated January 16, 1906, stipulating that the company was to furnish from its factories, for sale by Taylor, one hundred tons of fertilizers, with guaranteed analysis and price per ton, to be delivered in car-load lots at the depot at Huggins, Ga., Taylor agreeing to receive all of said fertilizers for sale, and take the same and pay therefor the prices mentioned in the agreement; that until sold or settled for by Taylor, the fertilizers were to remain the property of the company, "and, when sold, all the proceeds of sale of such fertilizers, including cash, notes, open accounts, and collections therefrom, shall be kept separate and be held by Taylor as a trust fund, and turned over to said company as collateral security and pledge until the entire indebtedness of Taylor to the company, arising under this agreement, has been paid;" that shipments of fertilizers were to be made by the company before May 1, 1906, and payments of all shipments were guaranteed in full to the company, at prices stated; and settlements were to be made on or before May 1, 1906, by cash, or negotiable notes (on the company's regular form) of Taylor, maturing November 1, 1906, November 15, 1906, and December 1, 1906, each of said notes being payable at the Bank of Tifton, Ga.; that Taylor was to pay over to the company all the cash proceeds of sales made for cash, when sold, and on or before May 1, 1906, was to send to the company a complete list of his time sales, and indorse, if necessary, and surrender to the company all notes received by him from the purchasers of said fertilizers, which notes were to be taken on forms of the company, and to be returned by the company to Taylor, "for the purpose only of collection and remittance to the company, until his debt to it has been fully paid, as aforesaid; and when said notes are so returned to Taylor by the company, they are to be receipted

for in trust to the company by Taylor." (2) Taylor's three notes provided for in the agreement, payable to the company at the Bank of Tifton, Ga., due November 1, November 15, and December 1, 1906, and indorsed in blank by the company. (3) "Trust receipt," signed by Taylor, dated August 17, 1906, as follows: "Received of Virginia-Carolina Chemical Company, in trust for collection, for its account, as per terms and conditions of contracts made by ————— with said company, the following described notes and accounts [describing them], it being ·agreed that all money or cotton or other proceeds collected on them will always be held subject to order of Virginia-Carolina Chemical Company, until notes to them are paid in full." This receipt contains a list of the notes set forth in the indictment, giving names of the makers of each note, dates, and amounts. The State also introduced some of the notes described in the indictment, marked "Paid," and proved by the makers that the proceeds thereof had been paid to the defendant; and also showed, by oral evidence, that many of the notes described in the indictment and trust receipt had been paid by the makers to Taylor. In these latter cases, the paid notes themselves were not introduced in evidence. The State introduced a letter from Taylor to the company, dated December 27, 1906, notifying it that he had been robbed Monday night of $1,373 of money that he had in his possession, belonging to the company. An admission of the defendant, made to the agent of the company who demanded the money collected on the notes, that he had collected the whole amount of the notes, was also proved. The defendant, in his statement to the jury, qualified his admission, by stating that he had collected about $900 due on the notes; and, explaining why he had not sent this amount to the company according to his contract, aside, that he was waiting to collect the full amount, so as to pay in full his three notes held by the company for the fertilizers; that he added to the amount collected, belonging to the company, enough of his own money to make the amount $1,373, and that this sum was ·in his satchel in his store, and the store was broken open and the satchel entered and the whole amount stolen. He introduced some fifteen of the notes which he claimed had not been collected. These notes were among those set out in the indictment, and were all made payable to the defendant, and were indorsed by him in blank. On

the merits of the case, it will, therefore, be seen that the defendant admitted on the trial the trust delegated to him by the company, and that he had collected the larger part of the notes intrusted to him, but set up as a defense for his breach of the trust the burglary of his storehouse and the larceny of the money.

The first assignment of error is that the court erred in admitting in evidence the trust receipt signed by the defendant, because said receipt showed a different trust from the one alleged in the indictment. The indictment charged that the notes therein described, and set out in the "trust receipt," were intrusted to the defendant for the purpose of being collected by him and paying the proceeds so collected to the company; and the "trust receipt" stipulated that the notes were intrusted to the defendant for the purpose of collection, but that "all money or cotton or other proceeds collected on them will always be held subject to the order of the Virginia-Carolina Chemical Company." In other words, it was contended that there was a material variance in the allegations that the proceeds of the notes were to be collected and paid over to the company by the defendant, and the recitals in the "trust receipt" that the proceeds of the note were to be collected and always held subject to the order of the company. This "trust receipt" must be construed in connection with the terms of the original agreement between the defendant and the company, which was in evidence. This agreement provided that Taylor "will pay over to the company all the cash proceeds of sales made for cash, when sold, and on or before May 1, 1906, will send to the company a complete list of his time sales, and endorse, if necessary, and surrender to the company all notes received by him from the purchasers of said fertilizers, . . to be returned by the company to Taylor, . . for the purpose only of collection and remittance to the company, . . and when said notes are so returned to Taylor by the company, they are to be receipted for in trust to the company by Taylor." There is no evidence of any cash sales, but it is not disputed that Taylor did sell to various parties the fertilizers belonging to the company, did receive therefor their notes, did send these notes to the company according to the agreement, and that these notes were returned by the company to Taylor for the sole purpose of having him collect the same and pay over the proceeds to the company. This agreement, supplemented by the

oral evidence, fully proved the trust alleged in the indictment, and its breach by Taylor. The "trust receipt" was merely cumulative as to the nature of the trust created. We do not think, however, the statement in the "trust receipt," that the money—the proceeds of the notes—was to be held by the defendant at all times subject to the order of the company, described a different trust from that alleged in the indictment. It is clear, from the evidence and the admission of the defendant, that he was in no doubt as to the character of the trust delegated to him by the company.

It was insisted, in the next place, that the State failed to prove the allegation of the indictment, that the notes in question were "transferred and assigned" by Taylor to the Virginia-Carolina Chemical Company; and that this allegation was descriptive of the notes and should have been proved as laid. The writer is inclined to the opinion that this allegation is simply surplusage. It is alleged that the notes described in the indictment were the property of the company, and intrusted to the defendant for the purpose of collecting them and paying over the proceeds to the company. Taking this in connection with the facts that the notes were payable to Taylor, were sent by him to the company, and were intrusted by the company to Taylor as its property, for the purpose of having him to collect the proceeds and pay over the same to the company, the only rational conclusion was that the notes had been transferred and assigned by Taylor to the company; and the express allegation of that fact was simply the legal conclusion of the pleader. But whether this position be sound or not, any deficiency on this point in the proof offered by the State was fully supplied by the evidence of the defendant. The fifteen notes introduced by him were each payable to the order of the defendant, and were each indorsed in blank by him and sent to the company, and by the company intrusted to the defendant for the purpose alleged in the indictment. These notes were all described in the indictment, among the others which the evidence showed had been collected by the defendant. It is a fair and reasonable inference that the notes collected by Taylor had also been indorsed by him. On three of the notes shown to have been indorsed by the defendant and sent to the company, there appeared credits amounting to $30 or $40; and as the defendant admitted that he had not paid to the company any part of the proceeds of

any of the notes, the allegation that the notes were "transferred
and assigned" to the company by the defendant was fully and even
technically proved.

The court allowed several of the makers of the notes to testify
that they paid to the defendant these notes and that he delivered
the notes into their possession. This testimony was objected to,
on the ground that the notes and entries of payment thereon were
the best evidence of the fact of payment. Testimony by the maker
of a note that he had paid it in full and that it had been delivered
up to him by the holder was competent and admissible, without
the production of the note itself.

Error is assigned as to certain portions of the charge of the
court. A careful examination of the entire charge leads us to the
conclusion that there is no merit in any of these assignments. The
charge fully, fairly, and clearly submitted the issues and the law
applicable thereto.

During the progress of the trial, the court propounded many
questions to the witnesses on both sides. A large number of these
questions are specifically objected to, because they were not only
"leading and suggestive, but clearly indicated to the jury an
opinion of the court as to the guilt of the defendant." A great
part of this examination of the witnesses was as to the collection
of the notes intrusted to the defendant. There was no controversy
over this fact. It was not denied that the notes were all intrusted
by the company to the defendant, to be collected and the proceeds
paid over by him to the company. The defendant admitted, in
his statement to the jury, that he had collected about $900 on the
notes, and had not paid any of it to the company. So this part
of the examination of the witnesses by the judge, even conceding
that it was justly amenable to the criticism made, could not have
been in any manner material or harmful to the defendant. As be-
fore stated, the defendant did not deny, but fully admitted the na-
ture and purpose of the trust. He admitted that he had collected a
large portion of the money represented by the notes intrusted to
him and had not remitted any part of it to the owner. In short,
he admitted every material allegation of the indictment, except
the charge of fraudulent conversion. He set up, as an excuse for
the breach of the trust reposed in him, the burglary of the store-
house, where he had the money in his grip, and the stealing of

the same therefrom. This defense was a good one, if true, but it presented three weak points, which were vigorously assailed by the State: the absence of physical marks on the window or door of the storehouse, indicating a burglary; the conduct of the defendant before and immediately after the alleged burglary; and the unreasonableness of the statement that so large a sum of money should have been carelessly left in a small satchel in the store. There were other facts and circumstances, which, the State contended, proved the untruthfulness of this defense, and indicated that it was a sham or pretense to hide guilt.

It is in some cases difficult to determine when the judge violates the spirit of the positive limitations of his judicial right, as prescribed in section 4334 of the Civil Code. Talleyrand said, "Language is given to man to conceal his thoughts;" but the most adroit and careful use of words is necessary to hide from an alert juror an intimation of the opinion entertained by the trial judge. We know of no better test to apply to the language of a judge, claimed to contain and to intimate an opinion to the jury, than the impression made upon our own minds in reading and considering the words objected to. After a most careful consideration of the questions asked by the court for the purpose of elucidating the issues on the points of the defense above mentioned, we are convinced that the learned judge clearly, although unconsciously, gave expression to his incredulity as to the honesty and truth of the defense. On reading the evidence, we fully share in such incredulity. But the very weakness of a defense makes it all the more necessary that it should go to the jury without the ponderous handicap of judicial disparagement and discredit. The purpose of the legal inhibition against the expression or intimation of opinion by the judge is to protect a defendant in his weakness, as well as in his strength, and to preserve inviolate the priceless right of trial by jury. The province of the jury as the exclusive arbiters of facts is holy ground, not to be approached by the judge even with bare feet and uncovered head. The judge should sit on the bench the calm and impartial incarnation of law, as silent as the Sphinx on contested questions of fact. We do not deem it necessary to specifically point out the questions in the record which we think justly obnoxious to the foregoing criticism. Comprehensively stated, it is that part of the court's examination of the wit-

nesses which emphasized by suggestive questions the weakness of the defense in the particulars mentioned. We repeat what was said by this court in the *Sharpton* case, 1 *Ga. App.* 548 (57 S. E. 932) : "It is almost an intellectual impossibility for a judge to engage in an examination of a witness on vital questions of the case on trial, without in some manner, and to some extent, indicating his own opinion. Every practitioner knows how eagerly alert jurors are to every utterance from the bench, and how sensitive is the mind of the juror to the slightest judicial expression. Therefore, while the trial judge has the right to ask questions of the witnesses whenever necessary, to bring out the full truth of the case, we are not prepared to say that it is his duty to do so; and, in exercising the right, he should be careful not to intimate any opinion upon the facts, or use any expression calculated to prejudice the rights of either party." Even in a clear case of guilt, this court has no other alternative, and it desires no other, than to grant a new trial when it comes to the conclusion that the right of the defendant to have the fact of his guilt or innocence determined exclusively by the jury has been in the slightest degree infringed by judicial intimation or expression.          *Judgment reversed.*