## A04A1530. MILNER v. THE STATE.

(606 SE2d 91)

MIKELL, Judge.

Turyan Maurice Milner, who proceeded pro se at trial, was convicted of felony theft by shoplifting. Based on his multiple prior theft convictions, the trial court sentenced him to ten years, including five to serve. In his sole enumeration of error on appeal, Milner argues that the trial judge improperly expressed her opinion of his guilt in violation of OCGA § 17-8-57 by cross-examining him at length. Although bordering on adversarial, we conclude that the court's inquiry did not "seriously affect[ ] the fairness, integrity, and public reputation of these judicial proceedings."[1] Therefore, we affirm.

OCGA § 17-8-57 provides:

> It is error for any judge in any criminal case . . . to express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused. Should any judge violate this Code section, the violation shall be held by the Supreme Court or Court of Appeals to be error and the decision in the case reversed, and a new trial granted in the court below.

In *Paul v. State*,[2] the Supreme Court held that the "plain error" doctrine applies to allegations of improper judicial commentary.[3] Therefore, where, as in the case at bar, the defendant fails to object or move for a mistrial after the trial judge's remarks, we conduct a two-part inquiry. First, we determine whether the commentary was improper. Then, we review the commentary to determine whether it amounted to an obvious violation of OCGA § 17-8-57, meaning that it "seriously affected the fairness, integrity, [or] public reputation of these judicial proceedings."[4]

The remarks at issue are contained in the trial court's lengthy examination of Milner following his testimony. However, to put the court's remarks in context, we review the trial from the outset. In this regard, the record reveals that the trial court made a good-faith effort to assure that Milner, who adamantly refused to allow the court to appoint him counsel, received a fair trial. Milner had been indicted along with two accomplices, one male and one female, for shoplifting over $1,800 worth of merchandise from a K-Mart store in Rome,

---

[1] (Punctuation omitted.) *Paul v. State*, 272 Ga. 845, 849 (3) (537 SE2d 58) (2000), citing *Almond v. State*, 180 Ga. App. 475, 480 (349 SE2d 482) (1986).

[2] Supra.

[3] Id. at 848-849 (3).

[4] (Punctuation omitted.) Id. at 849 (3), citing *Almond v. State*, supra.

including fifty cans of baby formula, diapers, t-shirts, and assorted toiletries and health care items. Pat Davis, a loss prevention associate employed by K-Mart, testified that she saw a woman put numerous cans of baby formula into a shopping cart and exit through the front door. Davis followed her. After the woman pushed the cart onto the sidewalk, Milner drove up with his male accomplice in a burgundy van. The male accomplice motioned for the woman to proceed to the parking lot. The men drove to the lot, where the woman met them. Davis saw her throwing the cans of formula into the van. The entire incident was captured on two videotapes, which were played for the jury. After Davis testified on direct, Milner tried to cross-examine her, but Davis was unable to understand his questions. The trial judge, realizing the information that Milner was trying to elicit, questioned Davis for him.

Further, when Milner decided to testify, the court carefully explained to him how to avoid making statements that could open the door to evidence of his criminal history. Milner then made a statement to the jury. He testified that on the day of the incident, he came from Atlanta to look for work as a truck driver; that he gave his co-defendants a ride in exchange for gas money; that he did not know them beforehand; that they told him they wanted to go to Rome to shop; and that he did not suspect that anything was wrong until his co-defendants started throwing merchandise in the van. Milner claimed he drove away from K-Mart so he could figure out what to do. The prosecutor thoroughly cross-examined him, effectively discrediting his statement.

After the state concluded its cross-examination, the court began questioning Milner.

> THE COURT: I still don't understand what those people from Atlanta were doing with you that day.
> MILNER: Like I said, ma'am, I work for Command Labor and a lot of people go . . . all over Georgia for various jobs.
> THE COURT: I'm not asking what a lot of people do, I'm asking what they were doing with you.
> MILNER: That's what I'm saying. That's where I picked them up at the labor pool. . . .
> THE COURT: For what purpose?
> MILNER: Because . . . they wanted to ride with me.
> THE COURT: They wanted to ride with you . . . to Rome, Georgia?
> MILNER: Yes, ma'am. Well, no, I mean — I said earlier the destination had not been decided. . . . Like I said, I told them I was coming to the carpet capital of the world which . . . I felt like it was in the Rome area.

THE COURT: And . . . the purpose of that was to ride around and look at tractor trailers to do some research to determine who does the hauling for these companies?

MILNER: Yes, ma'am. . . .

THE COURT: Is that why you were at the K-Mart store?

MILNER: No, that was their decision. I had no reason to go to the K-Mart. That was their decision. That's why I was wondering what was taking so long. They're the ones that wanted to go to K-Mart.

THE COURT: You said a few moments ago that the K-Mart store often hires independent truck drivers and such. You weren't trying to imply that that's what you were doing at K-Mart?

MILNER: No, . . . that's why I didn't even get out of my van.

THE COURT: Okay. So then you went down to the Kroger store after that?

MILNER: Yes, ma'am.

THE COURT: And you say that wasn't for any purpose other than to figure out what was going on?

MILNER: Yes, ma'am. Because I said Kroger was — as far as I can remember, Kroger was the closest thing where I could park and put two and two together. I didn't make no attempt to go anywhere else.

THE COURT: Wasn't there a lot of parking right there behind Blockbuster and right around the area where Hooters is and where you don't have to get out onto the road right there in that big area in front of K-Mart?

MILNER: Well, I — there might be ma'am. I don't recall. But as I said, I didn't just blurt out to them, hey, I know you just stole all the stuff. . . . I wanted to make sure — I was sure what I was going to do and when I was going to do — I didn't know whether I should just keep driving. I didn't know if I should pull over to the curb and jump out and run. I didn't know what to do and I was trying not to panic.

THE COURT: Where specifically were you going to go that day to look at tractor trailers?

MILNER: Anywhere where I see trucks. . . .

THE COURT: Well, what truck stop were you going to go to in Rome?

MILNER: As I said, when I left, it wasn't particularly Rome. It was any city along 75 or in that vicinity.

THE COURT: You ended up in Rome.

MILNER: Yes, ma'am.

THE COURT: So what truck stop were you going to go to in Rome?

MILNER: From my recollection you can see K-Mart from where I was at. That's where they wanted to go to. I hadn't made a decision to go to any store in Rome. Rome was, you know, just an area. At the time, to tell you the truth, I didn't even know I was in Rome. I didn't know where I was at really as far as — I knew where I had — how I had got there off of 75 but I didn't know I was in the city of Rome.

THE COURT: Ms. Wetherington [(the prosecutor)], do you have any other questions in light of my questions?

MS. WETHERINGTON: No, Your Honor.

1. The trial court has the right to examine witnesses. "It is a court's right, and oftentimes its duty, to question a witness in order to develop fully the truth of a case."[5] However, that right should be exercised sparingly, particularly when the defendant is the subject of the court's examination. As explained in *Nobles v. State*,[6] "[e]xtreme anxiety to develop the truth as to facts which, if proved, will be peculiarly beneficial to one of the parties in the case and correspondingly detrimental to the other[,] can easily be mistaken by the jury for a manifestation of the judge's conviction that one party rather than the other should prevail."[7]

Therefore, a trial judge should not intervene to explain every ambiguity in the testimony. Instead, in Georgia, "[t]he judge should sit on the bench the calm and impartial incarnation of law, as silent as the Sphinx on contested questions of fact."[8] In the case at bar, the trial court's questioning of the defendant bordered on adversarial and could have been interpreted by the jury as an expression of opinion as to his guilt.[9] It follows that the judge violated OCGA § 17-8-57.

2. In determining whether the court's violation of OCGA § 17-8-57 "seriously affected the fairness, integrity, and public reputation of these judicial proceedings,"[10] we are not permitted to conduct a harmless error analysis.[11] But a court's improper commentary must be considered in context of the entire trial. In this case, the court attempted to guard the defendant's right to a fair trial in several respects. First, prior to trial, Milner tried to plead guilty and refused counsel, but the court urged him to reconsider. Then, at trial, the court assisted Milner in the cross-examination of a state's witness

---

[5] (Citations omitted.) *Eagle v. State*, 264 Ga. 1, 3 (3) (440 SE2d 2) (1994).

[6] 13 Ga. App. 710 (1) (79 SE 861) (1913).

[7] (Citations omitted.) Id.

[8] *Taylor v. State*, 2 Ga. App. 723, 729 (59 SE 12) (1907).

[9] See *Paul*, supra at 848 (2).

[10] (Punctuation omitted.) Id. at 849 (3), citing *Almond v. State*, supra.

[11] Id. at 848 (2), citing *Crane v. State*, 164 Ga. App. 638, 640 (1) (298 SE2d 619) (1982).

and warned him of the dangers of taking the witness stand. Thus, unlike the trial judge in *Paul*, who adopted a prosecutorial rule throughout the entire trial, the trial judge in the case at bar strove for a fair trial. Her improper cross-examination of Milner did not seriously affect the integrity of the proceedings, and reversal is not required.

Milner contends that he is entitled to a new trial based on the following oft-quoted principle: "The trial court's examination of a witness . . . is not cause for a new trial unless the court, during its examination of the witness, expresses or intimates an opinion on the facts of the case or as to what has or has not been proved, or the questioning becomes argumentative."[12] But this principle concerns the first prong of the *Paul* test: whether the trial court violated OCGA § 17-8-57. It has no bearing on the second part of the inquiry: whether a violation of the statute "seriously affected the fairness, integrity, and public reputation" of the proceedings. It follows that Milner is not entitled to a new trial on the basis of this tenet.

*Judgment affirmed. Blackburn, P. J., and Barnes, J., concur.*

DECIDED OCTOBER 14, 2004.

*Barry V. Smith, Bret E. Rudeseal*, for appellant.
*Leigh E. Patterson, District Attorney, Kay A. Wetherington, Assistant District Attorney*, for appellee.

---

[12] *Mullins v. State*, 269 Ga. 157, 159 (3) (496 SE2d 252) (1998), citing *Wilson v. State*, 229 Ga. 224, 225 (2) (190 SE2d 78) (1972), overruled on other grounds, *Holcomb v. State*, 230 Ga. 525 (198 SE2d 179) (1973).